1    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF LOUISIANA
2          SHREVEPORT DIVISION

3
     UNITED STATES OF AMERICA        *    Criminal Action
4                                         No. 07-50067-01
     VERSUS                          *
5                                         Shreveport, Louisiana
     LLOYD DEWITT TILLER, JR.        *    September 9, 2008
6
        *   *   *   *   *   *   *   *   *   *   *
7

8           TESTIMONY OF JAMES MICHAEL FLAHERTY
             TRANSCRIPT OF TRIAL PROCEEDINGS
9       BEFORE THE HONORABLE S. MAURICE HICKS, JR.,
          UNITED STATES DISTRICT JUDGE, and a jury.
10

11   APPEARANCES:

12       For the Government:    AUSA Robert Watts Gillespie, Jr.
                                AUSA Robin Samson McCoy
13                              U. S. Attorney's Office
                                300 Fannin Street, Suite 3201
14                              Shreveport, Louisiana  71101-3068

15       For the Defendant:    Mr. Ansel Martin Stroud, III
                                Tutt, Stroud & McKay
16                              920 Pierremont Road, Suite 308
                                Shreveport, Louisiana  71106
17
                                        AND
18
                                Mr. Michael Allyn Stroud
19                              Wiener, Weiss & Madison
                                Post Office Box 21990
20                              Shreveport, Louisiana  71120-1990

21
     REPORTED BY:               Marie M. Runyon, RMR, CRR
22                              Federal Official Court Reporter
                                300 Fannin Street, Room 4212
23                              Shreveport, Louisiana  71101
                                Phone:  (318) 222-9203
24

25   PROCEEDINGS PRODUCED BY MECHANICAL STENOGRAPHY AND TRANSCRIBED
     BY COMPUTER. THE COURT.

```
 1              (Witness called and sworn.)
 2                   DIRECT EXAMINATION
 3   BY MR. GILLESPIE:
 4   Q.    Morning, sir.
 5   A.    Good morning.
 6   Q.    Would you please give us your full name.
 7   A.    James Michael Flaherty.
 8   Q.    And Mr. Flaherty, how old are you?
 9   A.    Fifty-eight.
10   Q.    And are you from Canada?
11   A.    Yes, I am.
12   Q.    Were you raised in the Ontario area of Canada?
13   A.    I was actually born in Montreal and raised there, and
14   then --
15   Q.    You have to speak up a little.
16   A.    I lived the last 30 years or so in the Toronto area.
17   Q.    Yes, sir.  And what province of Canada is that?
18   A.    That's in Ontario.
19   Q.    And where did you attend college?
20   A.    At Princeton.
21   Q.    In the United States?
22   A.    At Princeton, New Jersey.  That's right.
23   Q.    And are you married?
24   A.    Yes.
25   Q.    And what is your wife's name?
```

 1   A.    Christine.

 2   Q.    And do you have any children?

 3   A.    We have three children who are triplet boys.  They're now

 4   17, 17, and 17.

 5   Q.    And what are their names, sir?

 6   A.    John, Galen, and Quinn.

 7   Q.    What's the last name, sir?

 8   A.    Quinn.

 9   Q.    And where is your family home?

10   A.    Our family home is in Whitby, Ontario, which is a town

11   that is about 30 miles east of Toronto.

12   Q.    And Toronto is a major city in Canada?

13   A.    It is, yes.

14   Q.    But you have an office in Ottawa; is that correct?

15   A.    Yeah.  The capital city is Ottawa and so I have my

16   minister's office there and my parliamentary office also.

17   Q.    And just to help us, how long does it take to drive from

18   Whitby, your home, to Ontario if the traffic is good?

19   A.    To Ottawa.

20   Q.    I'm sorry.  Yes.  Excuse me.

21   A.    It's about 3 hours and 45 minutes.

22   Q.    And is there a local county or district in Whitby?

23   There's a town of Whitby, right?

24   A.    Right.  There's a town and then there's the county.  They

25   call it a regional municipality now, which is the region of

1    Durham.

2    Q.    How would you describe your home in Whitby?

3    A.    It's an old farmhouse.  It's built of stone.  It was

4    built by the settlers in 1845.  It's on a hill, and it's on

5    about a little bit more than 4 acres of land.  It's fairly

6    prominent in town because it's on a hill.  Most people know

7    where we live.

8    Q.    All right.  Now, I need to ask you some questions.  First

9    of all, you were elected at a local office in your province?

10   A.    That's right.

11   Q.    Explain that to us.

12   A.    Well, we have -- we have provincial government which is

13   comparable to state government.  So the province of Ontario has

14   a government, and I was elected as a member of that legislature

15   in 1995.  Served in the government in various positions:  as

16   Minister of Labor, as Attorney General, as Minister of Finance,

17   Minister of Economic Development, in that government until I --

18   we were -- our government was defeated, actually, in 2003.

19   Q.    And were you elected a member of Parliament of Canada?

20   A.    Yes.  In January 2006.

21   Q.    For those of us who may not be familiar with parliament,

22   the term *parliament*, what is that?

23   A.    Well, it's comparable to Congress.  It's the British

24   tradition of an Upper House and a Lower House.  We have a

25   Senate which in Canada is appointed by the government.  We have

1    a -- we have the House of Commons, which is the law-making, the

2    primary law-making chamber, which has 307, 308 members from

3    across Canada, and I was elected as the member representing my

4    district in January 2006.

5    Q.    So out of the 308 members of Parliament, you are one of

6    those members?

7    A.    Yes.

8    Q.    And Parliament would be like the House of Representatives

9    in the United States Congress?

10   A.    The House of Commons is like the House of

11   Representatives.   Yes.

12   Q.    I'm sorry.   Thank you for correcting me.

13        Now, you are also a Minister of Finance, and how is that

14   connected to the government of Canada?

15   A.    It's a bit -- it's a bit different than the system here

16   in that the members of the Cabinet here are appointed by the

17   President and are not members of the House of Representatives

18   or the Senate; in Canada and in the other countries that follow

19   the British tradition, we get elected to the House of Commons,

20   we belong to a political party, and then the Prime Minister of

21   our -- who is the leader of our party, chooses certain members

22   of the -- who are elected to serve in his Cabinet in different

23   assignments.   And the assignment that the Prime Minister asked

24   me to do is Minister of Finance.

25   Q.    And in 2006 who was your Prime Minister?

1  A.    Well, he still is.  Prime Minister Stephen Harper.

2  Q.    And you are appointed as Minister of Finance?

3  A.    Yes.  I believe we were sworn in, in --

4  Q.    Say again, sir?

5  A.    We were sworn in, in February, early February.

6  February 6, 2006.

7  Q.    So you have two hats:  You're a member of Parliament, but

8  you're also a member of the action branch of the government of

9  Canada?

10 A.    Of the executive, that's right.  Yes.

11 Q.    Now, do you have any offices in Canada in connection with

12 your duties?

13 A.    I have my office as a member of the House of Commons

14 which is on Parliament Hill -- the Parliament buildings are

15 actually on a hill in Ottawa -- and I have my office as

16 Minister of Finance which is in an office building in downtown

17 Ottawa; and then I have in my riding, in my district in Whitby,

18 Ontario, I have an office there which is a service office to

19 help people who have problems with the government; and then I

20 also have an office in downtown Toronto which is a regional

21 office for ministers to use when we're in Toronto.

22 Q.    And who is Mr. Stockwell Day?

23 A.    He is one of my colleagues.  He's a member of Parliament

24 from Alberta -- British Columbia, sorry -- and he is the

25 Minister of Public Safety, which means he's responsible for our

1    federal corrections system, he's responsible for our

2    intelligence agency, he's responsible for the Royal Canadian

3    Mounted Police, and other responsibilities.

4    Q.    Now, you mentioned a few minutes ago there was a change

5    in government in Canada as a result of an election in 2006?

6    A.    Yes.  We had an election January 23, 2006, and the former

7    Liberal government was defeated by our Conservative government.

8    Q.    And that's the political party, some of the political

9    parties in Canada?

10   A.    Yes.  The two main ones are the Liberal Party and the

11   Conservative Party.

12   Q.    So the new leadership came in -- that would be the Prime

13   Minister -- and that's when you became Minister of Finance?

14   A.    Correct.

15   Q.    Before that you were a member of Parliament, though?

16   A.    I was a Member of the Provincial Parliament in Ontario

17   before that, yes.

18   Q.    Now, these elections in Canada, they occur on a different

19   basis than the U.S. elections; is that correct?

20   A.    Yes.  They're not -- they're not fixed every four years.

21   In the parliamentary tradition, the Prime Minister can go to

22   the Governor General and ask that there be an election.  That

23   has just happened in Canada.  We have just started a federal

24   election on Sunday.  And then when we have less than a majority

25   in the House of Commons, one party has less than a majority of

1    members, that party can be defeated in the House of Commons;

2    and when that happens, an election follows as well, if the vote

3    is on a confidence matter, like a budget matter.

4    Q.    And with the change in -- with an election and perhaps a

5    change in government, the policy of the government of Canada

6    will change also?

7    A.    Yes.

8    Q.    So in 2006 there was an election and the prime minister

9    who is presently in there was appointed or selected, I guess is

10   proper, and you were appointed Minister of Finance?

11   A.    Yes.

12   Q.    All right.  Now, before the present government, the 2006

13   election, had the prior government made suggestions or

14   proposals to change the tax policy of Canada on a variety of

15   places or things, including royalty trusts or income trusts?

16   A.    There had been discussions publicly in Canada by the

17   previous government about whether the income trust tax

18   structure was appropriate tax policy for the country.  There

19   had been rumors.  There had been some leaks that there might be

20   action by that government that caused some gyrations in the

21   stock markets in Canada, particularly the Toronto Stock

22   Exchange, and at the end of the day that government, that is,

23   the previous Liberal government, chose not to take action.

24   Q.    All right.  And when you became Minister of Finance, did

25   you also look at that policy?

A.   Not immediately.  I did begin to look at it with some

intensity in July 2006 because of what was happening to our

economy and the number of companies in Canada that were moving

toward becoming income trusts.

Q.   And why was that a concern to you?

A.   Well, for several reasons.  I mean, the first goal is

always fairness and balance in the tax system, and the more we

had corporations choosing a form of operating as income trust

entities, the more revenue was being lost; not only to the

federal government in Canada, but also to the provincial and

territorial governments across Canada.  And that was -- that

was one concern about fairness, because somebody has to pay the

taxes to pay for health care and education and the justice

system and the other things for which we're responsible in

Canadian government.  So that was a -- that was a fundamental

concern that we were seeing a major movement in Canada by

corporations to become income trusts.  The reason that was

important is that there would be less revenue for the

government of Canada if these companies exploited this tax

loophole on a broad basis in Canada.

     So I saw -- in 2006, after we became the government, I

saw the income trust sector increase by about $70 billion over

the course of the first ten months of that year.  I also saw

some of our major companies that are important operating

companies requiring major capital investment and reinvest, I

1    saw them becoming income trusts.  Two of them announced that

2    they were going to become income trusts.  Two of our large

3    communications companies, Bell Canada Enterprises and TELUS,

4    and one of our large energy, oil producing companies in Canada

5    also indicated that it was going to go in the direction of

6    becoming an income trust.

7         So this was going to fundamentally alter the Canadian

8    economy.  It was going to affect revenues, which is always

9    important because someone has to pay for the services which

10   I've already said, but it was also going to affect economic

11   growth because with the income trust structure most of the

12   funds are flowed through to the unit holders rather than like

13   most corporations do.  In the United States and Canada, there's

14   some dividends to shareholders, but there's also reinvestment

15   in the business so that you can grow and innovate.  And we need

16   that in what we hope is a dynamic economy, dynamic young

17   economy, like Canada.

18        So those were two of the main concerns when we started

19   looking at income trusts in the summer of 2006.

20   Q.    Then, on October the 31st, did you announce, as Minister

21   of Finance, a plan to correct these problems that you had

22   observed?

23   A.    We did.  We announced it after the stock markets closed

24   in the evening of October 31.  We had to do it without notice

25   because of what was obvious from what had happened with the

1  previous government, that if there were leaks to the media or
2  to stockbrokers, then there would be some people making a lot
3  of money in the stock market and other people losing unfairly.
4  So we were quiet about what we were doing.  Obviously, I kept
5  it among a small group of people.  There were no leaks.  We
6  watched the stock market all afternoon to make sure that
7  nothing had gotten out so that -- there were no aberrations, no
8  fluctuations in the market, and we were satisfied by the end of
9  the afternoon that that was so.  So then we made the -- we made
10  the announcement in the evening of October 31.
11  Q.    And what was your announcement?
12  A.    Well, we announced several things.  It was a tax fairness
13  plan.  We announced a four-year plan to phase out the favorable
14  tax status that was given to income trusts.  So those income
15  trusts that existed in Canada on October 31 could continue
16  conducting their business affairs as they had been with the
17  same tax system through to 2011.  So they were grandfathered.
18  For new trusts, if anyone incorporated a new trust after
19  October 31, 2006, then they would be subject to the same
20  taxation rules that corporations would be subject to.  Again,
21  this was to level the playing field so it didn't matter if a
22  company chose to do business as a corporation or it chose to do
23  business as an income trust, corporations and businesses would
24  be taxed the same.
25  Q.    All right.  And your proposal was put out, but that

1    didn't make it law, did it?

2    A.    No, not at all.  And we announced several other things,

3    several tax benefits for -- for older Canadians, for seniors.

4    We made a very important announcement about pension-splitting,

5    which was to -- the first time in our country that people have

6    been allowed to split income between a husband and wife.  If

7    one of them is receiving a pension and the other one is not,

8    that they can split it 50/50, in a simple case, and pay at

9    lower marginal tax rates.  So it's a substantial tax savings

10   for them.

11          The process is the minister, in this case me as Finance

12   Minister, makes an announcement.  We're a democracy.  We're in

13   a minority government, actually, so we couldn't push anything

14   through our parliament.  We had to convince enough people to

15   support enough members of the House of Commons and the Senate

16   to support our proposal, or else it would not become law in

17   Canada.  Not unlike the United States, there's a process where

18   a bill is introduced.  It goes to a parliamentary committee.

19   There are normally hearings by the parliamentary committee,

20   which there were with respect to the income trusts, the tax

21   fairness plan, and then the matter comes back to the House of

22   Commons.  It's voted on several times.  If it passes the third

23   reading in the House of Commons, then it goes to the Senate.

24   The Senate debates it.  If the Senate approves it, then it

25   gets -- this is sort of an anachronism, but royal assent, and

1   it becomes the law of the land.

2   Q.    So this process began with your announcement on
3   October 31?

4   A.    Yes.

5   Q.    And there were hearings in the various committees in
6   Parliament?

7   A.    Subsequently, yes.

8   Q.    And was there a hearing on about, if you recall, on
9   January the 17th of 2007?

10  A.    Yes.  The House of Commons, one of the House of Commons'
11  committees had hearings then, yes.

12  Q.    So the proposal is out there and it's being debated using
13  the legislative process of Canada?

14  A.    Yes.

15  Q.    Now, you mentioned earlier that you have three offices:
16  the Minister of Finance position office, Member of Parliament
17  office, and then your office at Whitby, your home --

18  A.    Yes.

19  Q.    -- is that correct?

20  A.    Yes.  And I have another one in Toronto.

21  Q.    Yes, sir.  I forgot about that one.

22        And when you are in Ottawa, you have an apartment or a
23  place you stay there away from home?

24  A.    Yeah.  When I decided to run federally, when the now
25  Prime Minister of Canada and I talked about me leaving

1    provincial politics and running federally, I -- part of the
2    arrangement was I was not going to move my family home.  So I
3    have a small apartment in Ottawa, in the city.  We keep our
4    family home in Whitby, and my wife was born and raised there.
5    Our three children have been raised there.  We've lived in this
6    house for, oh, more than 20 years.  One of my sons goes to the
7    local high school; the other two go to a high school a little
8    bit farther away.  They take the bus to school.  But this is
9    our family home.  Its where they play sports, you know,
10   football and soccer and hockey and all of those things, and I
11   was not going to uproot my family to go be a federal member of
12   Parliament.  So I commute, basically.  I get, try to get home
13   Thursday nights and spend three, try to spend three days a week
14   in the riding and at home.
15   Q.    Not only that, but as part of your duties as Minister of
16   Finance you travel around the world representing the government
17   of Canada?
18   A.    I do.  We're a G7 country.  We work regularly with the
19   U.S. Department of the Treasury and with Secretary Paulson, and
20   with Secretary Snow before him, and with the other countries
21   that are members of the G7.
22   Q.    Now, who is Lesli Tomlin?
23   A.    She was my assistant during 2006, into 2007, and on my
24   staff in the Department of Finance.
25   Q.    So she's a member of the staff of your office?

1    A.    Yes.

2    Q.    And that is the Minister of Finance office?

3    A.    Yes.

4    Q.    And she's known you for a while?

5    A.    Oh, yeah.  I've known Lesli for quite a while.  She's

6    been a political staff member over a number of years.  She was

7    on the Prime Minister's political staff for a time.  She's a

8    well-thought of, experienced staff member.

9    Q.    And did you come in contact with her concerning a certain

10   email that was sent to your Parliament Hill address?

11   A.    Yes.  She spoke to me about it.

12   Q.    And as Minister of Finance, you have a web site; is that

13   correct?

14   A.    Yes.

15   Q.    I'm going to show you an exhibit.  There's a book there

16   if you can't read your monitor.

17         MR. GILLESPIE:  May we pull up Exhibit 3, page 1,

18   please.

19   BY MR. GILLESPIE:

20   Q.    Sir, it's also in the -- if you can't read the monitor,

21   it's right there in your book.  Exhibit 3, sir.

22   A.    3?

23   Q.    Yes.  And your monitor may be able to -- can you see what

24   this is that the jury is looking at now?

25   A.    Right.

1    Q.    What is that, sir?

2    A.    That is the cover page of my web site at the Department

3    of Finance.

4    Q.    Would that be considered a one-page biography?

5    A.    Yes.

6    Q.    And that's you?

7    A.    That is.

8    Q.    And we've already covered the various things, a member of

9    Parliament and so forth.

10          MR. GILLESPIE:  Madam Clerk, can you scroll to the

11   bottom, the last sentence there where it says, "Mr. Flaherty is

12   married to Christine and they have triplet sons."

13   BY MR. GILLESPIE:

14   Q.    And that is right there on the web page?

15   A.    Yes.

16          MR. GILLESPIE:  Can you go back to the full page,

17   please.

18   BY MR. GILLESPIE:

19   Q.    And this is posted for what purpose?

20   A.    To provide information to the public about who the

21   ministers are and what our backgrounds are, basic backgrounds,

22   and so that people know.

23          MR. GILLESPIE:  Madam Clerk, can you go to the top of

24   the page, right under the word "Canada" and the little flag.

25   BY MR. GILLESPIE:

```
 1   Q.    And what is -- I'm going to give her a chance to
 2   highlight this.
 3         And what is this part of the web page?
 4   A.    That's showing people where they can go to get more
 5   information, what other pages there are.
 6   Q.    So if they want to contact us, someone can click on there
 7   and go and contact you?
 8   A.    Correct.
 9         MR. GILLESPIE:  Madam Clerk, would you show page 2 of
10   that exhibit, please.
11   BY MR. GILLESPIE:
12   Q.    And what is this, sir?
13   A.    That's a form that people can use in order to send a
14   message to me.
15   Q.    And so you're accessible to your constituents, the whole
16   of Canada?
17   A.    That's right.
18         MR. GILLESPIE:  Would you take that exhibit down,
19   please.
20   BY MR. GILLESPIE:
21   Q.    We talked about Ms. Tomlin.  Did you have an occasion to
22   visit with her concerning a certain email that was sent to your
23   Parliamentary Hill address?
24   A.    Yes.  She spoke to me about the email that had been
25   received.
```

1  Q.    And where did she speak to you about that?

2  A.    I was in Toronto to give a luncheon speech, and I was

3  there that evening.  This is on the Monday, and I was leaving

4  the next day for Saskatchewan and Alberta and Australia, and

5  she sat me down on a couch in the lobby of the -- it's a large

6  hotel in Toronto -- and showed me on her, what you call a

7  Blackberry, on her device, showed me what the email said.

8  Q.    For those who don't know, a Blackberry is a telephone

9  that you can read emails on?

10 A.    Yes.  Text messaging.

11 Q.    And let me . . .

12         MR. GILLESPIE:  Bring up Exhibit 1, please.  And can

13 you go to the top of the page, where it starts off "Flaherty."

14 BY MR. GILLESPIE:

15 Q.    All right.  Mr. Flaherty, this is a paper copy of that,

16 but is this the message that Ms. Tomlin showed you?

17 A.    Yes.

18 Q.    And it says there, "To:  Jim Flaherty, MP."  That would

19 be your Member of Parliament address on Parliament Hill?

20 A.    Yes.

21 Q.    And then the subject is what?

22 A.    "Your throat cut."

23 Q.    And then who it's from, the "ltiller203@aol.com," were

24 you ever familiar with this, prior to this event, this

25 "ltiller203@aol.com"?

1   A.   No.

2   Q.   Did you have any idea who was sending this message?

3   A.   No.

4   Q.   And what did -- did you read this message from

5   Ms. Tomlin's Blackberry device?

6   A.   I did.

7   Q.   Is it the same message as here?

8   A.   Yes.

9   Q.   Would you read it aloud, please.

10  A.   "I am going to cut your motherfucking throat.  I swear to

11  God.  You can't hide.  I will find you."

12           MR. GILLESPIE:  Thank you, Madam Clerk.

13               (Exhibit removed from display.)

14  BY MR. GILLESPIE:

15  Q.   Now, had you receive an email like this in your political

16  history in Canada?

17  A.   No.  I get lots of messages from people and lots of

18  criticisms and lots of compliments, but no one had ever

19  threatened to cut my throat, no.

20  Q.   All right.  And how did you take this?

21  A.   Seriously.  Lesli was concerned, and so I was concerned

22  because she was concerned.  And it was, as I say,

23  extraordinary.  We don't get messages like this.  I've been in

24  politics since 1995 and I've never received a message like

25  this.  So this was concerning, concerning in the sense, too,

1  that we did not know who this was or where this person was.  We

2  did not know any of the background.  The Royal Canadian Mounted

3  Police were looking into it, but they were just beginning to

4  look into it because they had just been given a copy of it

5  about the same time.  It was -- you know, I was apprehensive

6  about it.  I just didn't know who this person was or what would

7  cause them to use the words that were used here and make the --

8  make the very serious threat that was there.  So I was

9  concerned about that.

10      I was also concerned that I was leaving Canada.  I was

11  going to Australia for a G-20 finance ministers meeting.  I

12  wasn't concerned so much about myself.  I'm always concerned

13  about my family.  And as I say, most people in town know where

14  we -- know where we live.  So that's how I felt about it.

15      Lesli was concerned about it, and she's experienced, so

16  that made me concerned, too, because she's worked with the

17  Prime Minister, also, and has seen lots of messages, but this

18  was -- this was a message of a different kind qualitatively.

19      So what I did was, I called the Minister of Public Safety

20  who you mentioned earlier, Stockwell Day, told him about what

21  had been received, and then the RCMP became engaged.  There was

22  much more security for me.  Our local police, our Durham

23  police, and our region got engaged in that, also.  The -- and

24  started watching the house more.  And then they put what they

25  call -- I think they call them alarm buttons.  They're like

1    panic buttons.  They put them in my family home and also in my

2    apartment in Ottawa.

3         And then I left the country, because I was going to

4    Australia.  But when I came back, I had 24-hour -- 24/7

5    security, with an RCMP driver and an RCMP bodyguard, which went

6    on 24 hours a day for four months or so.

7    Q.    And you did not have that before this email was sent?

8    A.    No.  I would have security from time to time at public

9    events, but it wasn't normal.  As I say, thank goodness, I had

10   not received a threat like this before and it was not

11   considered necessary, nor did I feel it necessary in my own

12   community, in Toronto, in Whitby, in Ottawa, you know, in my --

13   I drive my own car at home.  I go out to the store.  I go

14   shopping.  I know people.  I knock on doors during election

15   campaigns, as I will when I get back this week.  This is not

16   a -- it's not a tradition for me and for us, our government, to

17   have a lot of security.  It wasn't felt to be necessary without

18   this kind of threat.

19   Q.    And you had an RCMP driver assigned and a vehicle

20   assigned to you; you didn't drive anymore?

21   A.    That's right.

22   Q.    And you had a bodyguard assigned to you?

23   A.    Yes.

24   Q.    Did you tell your wife about this?

25   A.    I told her there was an issue.  I didn't get into too

1   much detail with her right at the beginning.  But then when she

2   realized I had a bodyguard all the time, she wanted to know

3   more, so I told her more.

4   Q.    Now, we have a second communication.

5         MR. GILLESPIE:  Would you show the jury and the

6   witness Government Exhibit No. 2, please.

7   BY MR. GILLESPIE:

8   Q.    Can you see it, sir?  If you need to get the hard copy,

9   I've got it here.

10  A.    I need to put my glasses on.

11  Q.    Yes, sir.

12        Do you know who Patrick Byrne is?

13  A.    He's with the Department of Finance.

14  Q.    Right.  And this -- further down it says "your name," it

15  says "subject data posted to Form 1."  And that's your web

16  site, isn't it?

17  A.    Yes.

18  Q.    All right.  And so where it says "your name," do you know

19  who "L.T." was or is?

20  A.    No.

21  Q.    And then it says subject -- do you see the "Sent From"

22  line?  What does it read, sir?

23  A.    "Ltiller203 aol.com."

24  Q.    And then you have the "comment" section; is that correct?

25  A.    Yes.

1   Q.    And were you informed -- see the "comment" section there?

2   Were you informed of the text of this message?

3   A.    Yeah, I was informed about it.  Yes.

4   Q.    Sir?

5   A.    Yes.

6   Q.    Okay.

7   A.    Yes.  Sorry.

8   Q.    And this message is different from the first; is that

9   correct?

10  A.    Yes.

11  Q.    Did the first one mention any political issue in the "cut

12  your throat"?

13  A.    No.

14  Q.    In the second one there is reference to the tax policy;

15  is that correct?

16  A.    Yes.

17  Q.    Now, what was -- what -- aside from the tax policy issue,

18  what struck you about this communication particularly?  What

19  part of this?

20  A.    Well, the last part, "Your three boys need to be hung,

21  too."

22  Q.    Well, before that, can you read aloud where it starts

23  off -- after "I swear to God on a Bible, it is not going to be

24  funny," what's the next line?

25  A.    "You need to be hung, you sorry motherfucker.  Your three

1   boys need to be hung, too."

2   Q.    All right.  But what attracted -- what got your attention

3   was your children; is that correct?

4   A.    That's right.

5   Q.    Do your -- your sons, they were teenagers at this time;

6   is that correct?

7   A.    Yeah.  They would have been 15 then.

8   Q.    Do your three teenage sons have anything to do with the

9   tax policy of Canada?

10  A.    No.  They're not too interested in that.  Sports and

11  things, not tax laws.

12  Q.    Again, did you know who "ltiller203@aol.com" was at this

13  time?

14  A.    No, I did not.

15  Q.    And again, how did this second communication strike you?

16  A.    Well, I was very concerned with the allegation, the

17  threat against the three boys which caused severe concern.

18  That has never happened before that my family has been

19  threatened.  And what was said was serious, "You need to be

20  hung, you sorry mother . . .," you know, "Your three boys need

21  to be hung, too."  That was serious, and I was away again.  I

22  was in china, in Beijing, when this happened.  And I am away a

23  lot, and that causes concern about the safety of my family.

24          MR. GILLESPIE:  Thank you, Madam Clerk.

25              (Exhibit removed form display.)

```
 1              MR. GILLESPIE:  Your Honor I tender the witness.
 2              THE COURT:  All right.  Mr. Stroud, your cross-
 3      examination.
 4                        CROSS-EXAMINATION
 5      BY MR. A.M. STROUD:
 6      Q.    Morning, Mr. Flaherty.
 7      A.    Good morning.
 8      Q.    My name is Marty Stroud and I represent Mr. Tiller.
 9            You indicated that you're a, I take it, a member of the
10      Conservative Party?
11      A.    Yes.
12      Q.    In Canada?
13      A.    Yes.
14      Q.    And in reading articles, when a party is referred to as a
15      "Tory Party," are those words used interchangeably in Canada?
16      Is the Conservative Party also referred to as the "Tory Party"?
17      A.    Yes.
18      Q.    And you had an election.  When you came to power, it was
19      in 2006; is that correct?
20      A.    Yes.
21      Q.    And you used the term -- when you -- did the Conservative
22      Party secure enough votes in Parliament to form a government
23      alone or did it have to form a government with other parties?
24      A.    Neither one.  We did not get a majority of the 308 seats.
25      We got about 125.  So the Governor General called on us, as the
```

1 | party having the greatest number of seats in the House of

2 | Commons, to form a government.  But we did not have a majority.

3 | We would need to be supported by other parties on particular

4 | pieces of legislation for them to become law.

5 | Q.    So despite the fact that the Conservative Party was not

6 | able to secure a majority, it nevertheless, pursuant to effort,

7 | formed a government?

8 | A.    Yes, we formed a government.

9 | Q.    And the Prime Minister was Mr. Harper?

10 | A.    Still is.  Yes.

11 | Q.    And he hired -- oh, I shouldn't say "hired."  He selected

12 | you to be the Finance Minister; is that correct?

13 | A.    Yes.

14 | Q.    And how many members are in the Cabinet?

15 | A.    Oh . . .

16 | Q.    Approximately.  I don't --

17 | A.    Yeah.  Depends on --

18 | Q.    Ten?  Fifty?  I don't --

19 | A.    No.  No.  About 25.

20 | Q.    And are these also known as, in parliamentary sessions,

21 | "front benchers"?

22 | A.    Yes.

23 | Q.    And when you see the -- I don't know if you do.  I think

24 | Canada does the same thing.  I've watched Parliament; when

25 | there's a debate between the two parties, the people sitting

1   behind the leader would be the various finance -- I mean,

2   various Cabinet members?  During the debate.  I don't know if

3   you do the same way they do in Parliament in London.

4   A.    We do.  We -- "front benchers" really refers to the fact

5   that we sit in the front row.  The Prime Minister is one of us,

6   and he sits in the front row.  He sits a chair over -- two

7   chairs over from me.  And behind -- the first couple of rows in

8   our House of Commons are members of the Cabinet.

9   Q.    Now, you indicated that the Liberal -- there had been

10  discussions or rumors that the Liberal Party was floating ideas

11  or discussing a proposed tax on income trusts, but that plan

12  was never followed through; is that correct?

13  A.    Correct.

14  Q.    Now, would you agree with the statement that, as I

15  appreciate it, income trusts are popular with seniors because

16  they provide regular payments that are used by many to cover

17  the cost of groceries, heating bills, and medicine?

18  A.    They were -- income trusts were sold to many seniors by

19  brokers and investment bankers on that basis, yes.

20  Q.    Would you agree with that statement?

21  A.    There was a tax advantage, yes.

22  Q.    In fact, would it surprise you if that statement was

23  actually made by Stephen Harper on October the 26th, 2005?

24  A.    No.  He had spoken about the issue during the election

25  campaign.  That's true.

1  Q.    And in the election campaign, isn't it a fact that one of

2  the platforms of the conservative government was, and I quote:

3  "A Conservative government will stop the Liberal attack on

4  retirement savings and preserve income trusts by not imposing

5  any new taxes on them"?

6  A.    Yes.

7  Q.    So that was a campaign pledge or promise of the

8  Conservative Party?

9  A.    Yes.

10  Q.    And the Conservative Party then formed its government?

11  A.    Correct.

12  Q.    And then on, I believe, October the 31st, 2006, there was

13  an announcement made from -- was it made by the government or

14  from your office about the proposed tax on income trusts?

15  A.    I made the announcement.

16  Q.    Was it -- did you have a press conference, or was it a

17  press release?

18  A.    Both.

19  Q.    There was a lot of -- there was public reaction to this

20  announcement, correct?

21  A.    Yes.

22  Q.    There was an uproar over it?

23  A.    Yeah.  Well, there was a lot of concern.  You can call it

24  an uproar.  There was a lot of concern, yes.

25  Q.    It was a concern that the Conservatives had broken their

1  promise?

2  A.    Yes.  We knew that there was going to be a substantial

3  concern because of what we felt we had to do for the good of

4  the country.

5  Q.    And, in fact, I believe Mr. Harper repeatedly stated that

6  a Conservative government would never allow --

7       MR. GILLESPIE:  Your Honor, object to the hearsay

8  nature of the question.

9       MR. A.M. STROUD:  It's not hearsay, Judge.

10      THE COURT:  How is it not hearsay?

11      MR. A.M. STROUD:  It's for the fact of the matter.

12 It's the basis of their party platform.

13      MR. GILLESPIE:  Your Honor, I don't have any

14 questions if he asks this witness any questions, but not to

15 read in someone else's statement as if it was Mr. Flaherty's.

16      THE COURT:  So long as it's having to do with the

17 party's platform as opposed to what somebody else says, it's

18 admissible.  Phrase your questions accordingly, Counsel.

19 BY MR. A.M. STROUD:

20 Q.    Your platform was that a Conservative government would

21 not tax the trusts?

22 A.    That had been what the position had been during the

23 course of the election campaign, that's true.

24 Q.    And that the purpose -- and then on -- shortly

25 thereafter, the -- you appeared, you indicated in response to

1    Mr. Gillespie, you appeared on the floor of the Parliament and

2    there was discussion about, between the other party, about this

3    new proposal?

4    A.    I'm not sure where you are in time.  Are you after the

5    announcement --

6    Q.    After the --

7    A.    -- on October 31?

8    Q.    Yes.

9    A.    After -- well, on the -- this is getting into

10    parliamentary procedure.  On the day I made the announcement,

11    the leader of our party in the House of Commons filed a motion

12    in the House of Commons indicating that we were planning to

13    take this tax legislation forward.

14    Q.    And during that debate did you not say that the purpose

15    for the change in policy was to level the playing field for all

16    Canadians by not defending special interests, the 15% tax rate

17    for all American investors?  So you singled out Americans?

18    A.    All investors outside Canada were paying a 15%

19    withholding tax on income trusts, and they were paying whatever

20    taxes they were supposed to pay, I hope, in the countries in

21    which they reside.

22    Q.    And wasn't it a fact, or isn't it a fact that you

23    specifically identified the American interests in your

24    statements on the floor?

25    A.    That's right.  Because the industry had indicated that

1    about 50%, five zero percent, of the large energy income trusts

2    in Canada were held by Americans.  Yes.

3    Q.    In fact, you also discussed the fact that, and referenced

4    the fact that, an American couple had submitted a claim for

5    damages against the government of Canada under NAFTA for the

6    surprise decision to tax income trusts with the Canadian energy

7    sector.  Do you remember discussing that?

8    A.    I remember the issue coming up and it was resolved by the

9    United States Government not permitting the complaint to go

10   forward.  That was a decision by the United States Government,

11   not ours.

12   Q.    And that was a claim filed by American citizens?

13   A.    I understand it was.  Yes.

14   Q.    Do you know how much loss was occasioned on the days

15   following your announcement of the change in policy?

16   A.    I can't -- I can't give you a figure.  The only people

17   that lost money were people that panicked and sold their income

18   trust units in the few days -- in the immediate period after

19   the announcement.  Those who chose to continue with the

20   investments as of the beginning of September, including

21   distributions, they're up about 14.5%.

22   Q.    Well, are you familiar -- do you know Rob Carrick with

23   the *Globe and Mail*?

24   A.    He's one of the reporters there.  Yes.

25   Q.    Are you aware that he has written in the many --

1          MR. GILLESPIE:  Your Honor, I object again to

2     hearsay.

3          MR. A.M. STROUD:  This is not hearsay, Judge.  This

4     shows public sentiment.  This is in response to what --

5          MR. GILLESPIE:  Your Honor --

6          THE COURT:  Hang on.  In this instance, your question

7     has to do with knowing someone with a newspaper?

8          MR. A.M. STROUD:  Yes, sir.

9          MR. GILLESPIE:  The next part, Your Honor, may not

10    be -- is that he's going to quote that person.  That is

11    hearsay.

12         THE COURT:  That is hearsay.

13         MR. A.M. STROUD:  It's introduced for the fact that

14    it was said, Judge.  This shows the atmosphere in Canada.

15         MR. GILLESPIE:  Your Honor, I don't have any question

16    or problems with --

17         THE COURT:  As to the atmosphere in Canada, this

18    witness is well-capable of explaining that without the use of

19    hearsay newspaper quotes.  Sustained.

20    BY MR. A.M. STROUD:

21    Q.   Are you aware that people are still angry and persistent

22    in Canada, that anger still exists?

23    A.   There's still some concern.  It has modified very

24    dramatically over the course of the past two years, I think

25    largely because the market came back well and the distributions

1    continued.  So people who had income trusts, given the

2    grandfathering over the two years, have continued to, if they

3    kept the trust, have continued to receive the distributions

4    over that period of time.  And as I say, including the

5    distributions, the market as of early September is up about

6    14.5%.  In fact, it's performing better than the overall equity

7    market.

8    Q.    Well, Mr. John Dielwart disagrees with you.  Do you know

9    who he is?

10   A.    No.

11            MR. GILLESPIE:  Your Honor --

12            MR. A.M. STROUD:  Judge, he is basing his

13   information --

14            THE COURT:  Whoa.  Whoa.  Whoa.  It's an anticipatory

15   objection at this point.  You may continue, Counsel.  It may

16   trigger an objection here in just a minute or a moment, even.

17   Ask your next question.

18   BY MR. A.M. STROUD:

19   Q.    There are many people who disagree with you; is that not

20   correct?

21   A.    About what?

22   Q.    About the effect that the markets recovered?

23   A.    No, I don't think so.  I think that, generally, people

24   have looked at the numbers and they realize that the market has

25   recovered well.  In fact, that's been published recently in

1    some of our journals.

2    Q.    Well, one journalist, Mr. John Dielwart, would disagree

3    with that.  Do you know him?

4    A.    No.

5    Q.    He's the CEO of ARC Energy Trust.  Are you familiar with

6    ARC Energy Trust?

7    A.    I know the company.

8    Q.    And he said this will be an election issue this year?

9    A.    I don't know what he said or didn't say.

10   Q.    What about Mr. John Vitove, V-I-T-O-V-E?

11   A.    I know John Vitove, yeah.

12   Q.    He's the CEO of Priszm Canadian Income Fund.

13   A.    Yes, sir.

14   Q.    Is that a big company?

15   A.    It's a substantial company, yes.

16   Q.    He has objections --

17         MR. GILLESPIE:  Your Honor, this is asserted as a

18   statement of that person.  That is hearsay, I believe, Your

19   Honor.

20         THE COURT:  It is hearsay in this context.

21         MR. A.M. STROUD:  Judge, the witness said --

22         THE COURT:  Move on, Counsel.  You've already

23   demonstrated your point.

24   BY MR. A.M. STROUD:

25   Q.    Now, another reason that you indicated that there was

1  a -- that you wanted this policy was because of tax leakage; is

2  that correct?

3  A.    Yes.

4  Q.    And what is tax leakage?

5  A.    Revenue lost by various governments because of this tax

6  loophole and because of the increasing use of the tax loophole.

7  Q.    And isn't it a fact when questioned about this by the

8  other party you produced documents to support your position?

9  A.    The Department of Finance did, and I presented them.

10  Yes.

11  Q.    But the problem was, the documents you presented, the 18

12  documents presented were all blacked out and the information

13  wasn't there?

14  A.    Well, we presented information to the House of Commons'

15  Committee on Finance to substantiate the fact that the revenue

16  loss anticipated to the government of Canada would be in the

17  area of $500 million a year.  In addition, the revenue losses

18  to the ten provinces in Canada would be comparable.  So we were

19  looking at a revenue loss of about $1 billion a year.

20  Q.    But the documents themselves were blacked out?

21  A.    Some of the documents were blacked out.  This is done in

22  accordance with the Access to Information law in Canada.

23  Q.    And do you know Mr. Marcel Coutu?  C-O-U -- I may be

24  mispronouncing it.  C-O-U-T-U.

25  A.    Yes.

1   Q.    He's the CEO of Canadian Oil Sands Trust?

2   A.    Yes.

3   Q.    And are you aware he disagrees with your position?

4         MR. GILLESPIE:  Your Honor, I again object.  I think

5   the Court's ruled.  I'll stand up each time he asks the

6   question, but I would object.

7         THE COURT:  It's becoming cumulative.

8         MR. A.M. STROUD:  Judge, this witness --

9         THE COURT:  I don't think that there's any doubt that

10  there was disagreement with the policy.  You've established

11  that, Mr. Stroud.  I don't know where you're going with this,

12  but it is obviously cumulative and now involves hearsay again.

13  The fact that there was disagreement has been established.

14  Move on.

15  BY MR. A.M. STROUD:

16  Q.    How long has your government been in power?

17  A.    Since January 23, 2006.  Parliament was just dissolved on

18  Sunday, so.  We're in an election period now.

19  Q.    It's an election season?

20  A.    Right.

21  Q.    Did you receive or did anybody -- did you receive a

22  letter of a -- from Mr. Tiller?

23  A.    I saw a draft of a letter that I was told was being

24  proposed by Mr. Tiller.

25  Q.    Did you ever see that letter?

1    A.    I've seen the letter since.  Yes.

2          MR. A.M. STROUD:  I'd like for him to see Government

3    Exhibit 43.

4          MR. GILLESPIE:  Your Honor, may we approach the

5    sidebar, please?

6          THE COURT:  Briefly.

7                    (At sidebar.)

8          MR. GILLESPIE:  The exhibit he's talking about is a

9    letter Mr. Tiller wrote in May of this year to Minister of

10   Finance.  He did not see that letter until last night, first

11   off.  Secondly, it's hearsay on its face under 801 and 802.  It

12   is not admissible for any purpose.

13         THE COURT:  Give me more information about the letter

14   itself.

15         MR. A.M. STROUD:  I'm entitled -- the Government said

16   they were going to introduce the letter.

17         MR. GILLESPIE:  No, I didn't.

18         MR. A.M. STROUD:  Yes, you did.

19         MR. GILLESPIE:  I said --

20         MR. A.M. STROUD:  You told me that.  I'm entitled to

21   rely on those representations.  The only documents you said you

22   weren't going to introduce were the ones that Ms. McCoy listed.

23         THE COURT:  Hang on.  Let's look at the exhibit book

24   tendered to Chambers.

25         MR. GILLESPIE:  Your Honor, I talked to Mr. Stroud

1    about that because -- and I agreed that we would document it,

2    but I never told -- this Mr. Stroud, Mr. Allyn Stroud.  But I

3    never said that I would agree to introduce it.  It's blatant

4    hearsay.

5              MR. A.M. STROUD:  Why did you put it in as an

6    exhibit?

7              MR. GILLESPIE:  Because Mr. Stroud, Allyn Stroud, I

8    told him we would image it.  It may be useful later on.  If

9    Mr. Tiller takes the witness stand, it may be useful.

10             THE COURT:  What relevance does it have to this trial

11   now?  It's dated May 16, 2008.  What relevance does it have to

12   the 2006 issue?

13             MR. A.M. STROUD:  To show his position, show he

14   admits it.  We admit he said it.  It's not a --

15             THE COURT:  It's self-serving at best.

16             MR. GILLESPIE:  It's hearsay.  Yes, sir.  And it's an

17   out of state -- out-of-court statement by the defendant to

18   assert his position.  And this person, the Minister, did not

19   see this document in this form until last night, because I was

20   anticipating that Mr. Stroud would try to get it in evidence.

21             MR. A.M. STROUD:  It's not fair --

22             THE COURT:  In this instance, what I'm going to rule

23   is this:  You may use this with respect to your case-in-chief,

24   but in this form it has not been introduced into evidence.

25   This guy just saw it last night.  It appears to be a

1  self-serving statement made by Tiller and appears to be

2  potentially, in cross-examination of Mr. Flaherty, an attempt

3  to present a defense through the back door, which I'm not going

4  to permit.

5          MR. A.M. STROUD:  Judge, the Government said that

6  they were going to use documents -- I've been misled.

7          MR. GILLESPIE:  Your Honor, I've never said that.

8  Mr. Stroud heard that, but --

9          THE COURT:  You have my ruling.

10          MR. GILLESPIE:  Sir?

11          THE COURT:  You have my ruling.  It's sustained.

12          MR. A.M. STROUD:  Note my objection.

13          THE COURT:  Your objection is noted.

14                  (End of sidebar.)

15          THE COURT:  You may continue, Counsel.

16  BY MR. A.M. STROUD:

17  Q.    Mr. Flaherty, during the debate that you had about this

18  tax proposal, would you say that the debate was very heated?

19  A.    In Parliament?

20  Q.    In Parliament.

21  A.    We have lots of heated debates in Parliament.  It was

22  heated, yes.  We have others that are heated.

23  Q.    Is that issue -- is the issue relating to the tax of

24  income trusts, the proposed tax on income trusts, is that still

25  being debated?

1    A.    The matter is now law.  Some people are still objecting

2    that it is the law, but it went through the House of Commons,

3    it went through the Senate, and received royal assent, so it is

4    the law of Canada.

5    Q.    And were you aware of the fact that the solution -- you

6    said there were -- it didn't affect the market, but in the

7    United States shareholders were damaged to the tune of

8    approximately $35 billion?

9    A.    Well, as I say, if one follows the income trusts, and

10   including the distributions, through the period from

11   October 31, 2006, to the present, as of early September, in

12   fact, the market is up 14.5%.

13   Q.    The market may be up 14%, but with respect to income

14   trusts, they have lost $35 billion --

15   A.    I'm sorry.  I didn't make myself clear.  The income trust

16   market is up 14.5%.  It is in fact outperforming the equity

17   market if one looks at the TSE indexes which, is where most of

18   these Canadian income trusts trade.

19   Q.    And that's -- which one?  What did you look at?

20   A.    The Toronto Stock Exchange composite index for income

21   trusts, including reinvestments, and that's as of early --

22   September 3, 2008.

23   Q.    Did you reference the New York Stock Exchange?  Have you

24   looked at the blue chip stocks?

25   A.    Well, those, those ones that are income trusts, for the

1   most part, trade in Toronto on the Toronto Stock Exchange.

2   Q.    And that that reflects a $35 billion loss?

3   A.    Does not.

4   Q.    And that $26 billion worth of income trusts are totally

5   gone, you disagree with that?

6   A.    I do.  And if you're talking about what would have

7   happened if people panicked and traded within a few days of the

8   announcement, then there would have been a substantial loss.

9   But one doesn't have a loss until one sells, and for those

10  people who did not panic, the investment overall has come back

11  well.  In fact, those income trusts that were good businesses,

12  had good business fundamentals, have done rather well.

13  Q.    Well, isn't it a fact that many of the trusts changed

14  over to corporations?

15  A.    Some have chosen.  This is part of the grandfathering.

16  They have four years to decide whether to move to the corporate

17  model.

18  Q.    So they moved.  They moved from the trust sector to the

19  corporate sector based on the announcement of this policy?

20  A.    Some have; some have not.

21  Q.    Do you know how many have moved?

22  A.    No.

23          MR. A.M. STROUD:  May I have one second, Judge?

24          THE COURT:  You may.

25          MR. A.M. STROUD:  Nothing further.

1        THE COURT:  All right.  Redirect?

2        MR. GILLESPIE:  Just briefly, Your Honor.

3                    REDIRECT EXAMINATION

4   BY MR. GILLESPIE:

5   Q.    Minister Flaherty, when you say income, a person who owns

6   the income trust, they get a dividend check every month; is

7   that correct?

8   A.    Well, it's not really a -- it's a distribution check.  A

9   dividend is the corporate model.

10  Q.    And to your knowledge, on these companies, they continued

11  to pay these distributions through?

12  A.    Yes.

13  Q.    So if someone had a pension fund that was funded every

14  month, the check showed up every month?

15  A.    Yes, they did.

16        MR. A.M. STROUD:  Objection; hearsay and speculation.

17        MR. GILLESPIE:  Your Honor, Counsel asked him about

18  the distribution.

19        MR. A.M. STROUD:  And leading.

20        MR. GILLESPIE:  I'll rephrase the question, Your

21  Honor.

22        THE COURT:  Rephrase the question.  It is leading.

23  The topic is fair game.

24  BY MR. GILLESPIE:

25  Q.    All right.  If someone owns the income trust, would they

1  receive a dividend payment or some kind of monthly payment each

2  and every month?

3  A.    Most of them would pay monthly; some, quarterly.

4  Q.    And through this time period, before your policy

5  announcement and after, have these companies continued to make

6  distribution payments?

7  A.    Those that have remained in the income trust form, which

8  they can do until -- well, they can do, if they want to, on an

9  ongoing basis, but the tax advantage will be gone by 2011.

10  Q.    Now, do you have any control over the tax policy of the

11  United States of America?

12  A.    No.  Not at all.  Nor should we.

13         MR. GILLESPIE:  Thank you very much.

14         THE COURT:  All right, sir.  You may step down.

15                        *   *   *

16

17

18                        Certificate

19  I hereby certify this 18th day of December, 2008, that the
    foregoing is, to the best of my ability and understanding, a
20  true and correct transcript from the record of proceedings in
    the above-entitled matter.

21

22                              /s/ Marie M. Runyon
                                Official Court Reporter

23

24

25